**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 25-14096

Non-Argument Calendar

————————————

ROGER LEE MATTHIS,

*Plaintiff-Appellant,*

*versus*

JUBAL ROGERS,
ROGER FRAZIER,
QUOSHANNA WILLIAMS,
REGINALD MCCAIN,

*Defendants-Appellees,*

SOUTH FULTON POLICE DEPARTMENT,

*Defendant.*

————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:22-cv-04063-JPB

————————————

Before LUCK, LAGOA, and TJOFLAT, Circuit Judges.

PER CURIAM:

Roger Matthis sued four police officers from the South Fulton Police Department under 42 U.S.C. § 1983 for violating his Fourth Amendment rights. He alleged, among other things, that he was wrongfully arrested, issued a citation without probable cause, and maliciously prosecuted after he shot his former tenant in self-defense. The District Court granted summary judgment to the officers, finding them entitled to qualified immunity.

The record reveals that Matthis acted in self-defense and did not commit a crime. He was not only a victim of his former tenant's abuse, but also of a judge's carelessly issued ex parte restraining order, which precipitated the entire fiasco. The consequences of Matthis' arrest, including his loss of employment as a schoolteacher, are deeply regrettable. However, because the officers had at least arguable probable cause under the circumstances to arrest Matthis and issue him a citation, the District Court correctly concluded that the officers were entitled to qualified immunity.

We affirm.

## I. FACTUAL BACKGROUND

### A. Terry's Tenancy and Two TPOs

Terrill Terry began renting a room in Matthis' home in October 2019. During his tenancy, Terry allegedly committed several crimes against Matthis, including theft, stalking, assault, and reckless conduct. Perhaps the most egregious allegation entails Terry

stealing Matthis' senior dog and abandoning him on the highway.[1] Eventually, on the advice of Officer Reginald McCain, Matthis sought a restraining order from the Fulton County Superior Court.

On January 29, 2020, Judge Alexandra Manning issued an ex parte temporary protective order ("TPO") awarding Matthis the sole use of his residence and directing Terry to stay away from Matthis. The TPO was served on Terry the following day, and Terry was allowed to collect his belongings and leave the home. A hearing was set with Judge Manning on February 18.

The hearing was chaotic. Matthis began by informing Judge Manning that Terry was wearing several items stolen from Matthis, including a watch, a necklace, a belt, and a denim jacket. Terry told Judge Manning that the items were actually gifted to him because he and Matthis had been dating. Terry also "started being very flamboyantly gay and having lots of feminine gestures." Matthis assured the court that the two had never dated.

Although Matthis had photos to corroborate his side of the story, he had not printed them out for the court. Judge Manning notified the parties that she would not be extending the TPO, but she instructed Terry not to return to the house and told Matthis how to get a writ of possession to formally evict Terry. Matthis described what happened next:

> Mr. Terry smacked his lips and like rolled his eyes and he got up out of the defendant chair and he did a Tyra

---

[1] A neighbor found the dog and returned him to Matthis unharmed.

Banks runway walk over to me, swung his head around like he had a wig on and handed me the key to my house, and the whole courtroom erupted in laughter.

When the hearing concluded, Matthis filed for a writ of possession and left the courthouse. Terry called Matthis later that day. He told Matthis: "I don't give a f**k what that judge said. I'mma kick your door in." Matthis said that he would protect his home if Terry tried to break in, and Terry responded "what, with your BB gun, girl?" So, Matthis went out and bought a gun.

The very next day, Terry applied for an ex parte TPO of his own. Astonishingly, it was granted. And not only was it granted, but it was granted *by the very same Judge Manning* who had issued the first TPO and presided over the parties' hearing the day before.[2] The most inexplicable part of the second TPO is how Judge Manning filled it out.

Terry, in submitting his application for the TPO, had requested sole use of Matthis' home and an order directing Matthis to vacate. The application form was clear, however, that such provisions would only take effect if the issuing judge initialed them. It goes without saying that Judge Manning *should not* have initialed these provisions because (1) the home belonged to Matthis, not

---

[2] Judge Manning's profile on the State Bar of Georgia website touts a monthly case load of 450 ex parte TPOs, or approximately 20 per workday. *Alexandra Manning*, State Bar of Ga., https://icle.gabar.org/speaker/alexandra-manning-1264590.

25-14096                Opinion of the Court                5

Terry, (2) Judge Manning had instructed Terry to stay away from the home just one day earlier (at what should have been quite a memorable hearing), and (3) Matthis had done nothing wrong. So, what did Judge Manning do? Here is what we can see from the form:

Check ☑ the paragraphs below that apply to your case and fill in the information needed or enter N/A if it does not apply to you.

**PLEASE NOTE: ONLY THE FOLLOWING THAT ARE INITIALED BY THE JUDGE SHALL APPLY:**



8.    That until further Order by this Court, Petitioner is awarded sole and exclusive
[pco03]    use of the family residence at ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



9.    Respondent is ordered to leave the family residence immediately and law
enforcement_____**either**_____ (sheriff or police department) is
ordered to assist Petitioner in returning to the family residence and the removal
of the Respondent. Respondent is to immediately surrender to law
enforcement (sheriff or police department) all and any keys, garage door
openers and other security devices to the family residence and law
enforcement is to ensure that these are given to the Petitioner.

Clearly, it's a mess. Provision 8, which would have awarded Terry sole use of the house, was selected by Terry with an "X." But Judge Manning seems to have crossed out the X and wrote "NA," as in not applicable.[3] Provision 9 was also marked by Terry with an

---

[3] In their statement of material facts submitted to the trial court, Defendants stated with no ambiguity that Provision 8 was initialed by Judge Manning. As can be seen from the TPO, which Defendants themselves entered into the record, this statement misrepresents the facts and reveals a concerning lack of candor to the court. *See* Fed. R. Civ. P. 11(b) ("By presenting to the court a pleading, written motion, or other paper . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support[.]").

X. But unlike Provision 8, Provision 9 *does* appear to be initialed with an "A" for Alexandra—which is consistent with Judge Manning's initialing elsewhere on the TPO. And while Terry's X might appear to be crossed out, that marking is more consistent with an inadvertent extension of the horizontal line in the letter A. Provision 9, assuming it was initialed, authorized the police to remove Matthis from his home and to restore Terry's occupancy. It did so despite the fact that Provision 8, seemingly a prerequisite, was marked inapplicable.

### B. The February 20 Shooting

Armed with this contradictory and dreadfully inscrutable TPO, Terry solicited Defendant-officers Quoshanna Williams and Roger Frazier to serve the document on Matthis and to remove Matthis from his home. The officers accompanied Terry to Matthis' house on February 20 after dark. The altercation that ensued was a disaster. It was recorded in full by Officer Frazier's body camera and by Matthis' interior security camera.

As the group approached the front door, Officer Frazier encouraged Terry to knock, saying "you knock on the door, this is your house." Terry knocked on the door and rang Matthis' video doorbell several times. Both officers stood several feet behind Terry, and they soon moved even further away near the garage. Matthis did not answer the door, and Terry told the officers that he could not get in because Matthis changed the locks. Officer Frazier told him "I can't tell you how to get into your own house . . . that you have every right to be in . . . and he doesn't."

Terry then lowered his right shoulder and barreled his way through the door. With no hesitation, Matthis fired two bullets, striking Terry in the arm and leg.[4] The officers arrested Matthis and charged him with aggravated assault and possession of a firearm during the commission of a felony. Matthis was released on a signature bond the next day.[5]

On February 22, Officer Williams discovered a small abrasion on her police jacket. She informed her supervisor that the damage must have come from Matthis' shooting, and that she had recalled a "burning sensation" at the time but "didn't think to stop because [her] adrenaline was running." Her supervisor investigated the report by speaking with Officer Frazier and examining the jacket. He concluded that the damage was consistent with impact from a stray bullet.[6]

On February 25, Matthis returned to the police station to collect a copy of the police report. There, Captain Jubal Rogers told Matthis about the alleged stray bullet and threatened to charge Matthis with aggravated assault of a police officer. Captain Rogers briefly handcuffed Matthis and brought him to the interrogation

---

[4] Terry was taken to the hospital and eventually released.

[5] According to Matthis, the magistrate judge that presided over his bond hearing said, "I would have shot him, too."

[6] Matthis vigorously disputes this possibility, noting that both bullets were removed from Terry at the hospital and that Officer Williams was not standing near Terry at the time of the shooting.

room. But after Matthis showed the officers his security camera recording, and after further conversation, Captain Rogers decided to only issue Matthis a citation for reckless conduct. Matthis was allowed to freely exit the station.

### C. Matthis' § 1983 Suit

The Fulton County District Attorney's Office eventually declined to prosecute Matthis. But while the investigation was ongoing, Matthis was suspended and ultimately terminated from his teaching job at Dekalb County Schools. He also suffered intense public scrutiny.

Matthis sued Captain Rogers and Officers Frazier, McCain, and Williams in the United States District Court for the Northern District of Georgia. His amended complaint brought four § 1983 claims, along with state law negligence and malicious prosecution claims. The District Court granted summary judgment for the officers on all counts, finding them entitled to qualified immunity. Matthis appeals.

### II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in their favor. *Sutton v. Wal-Mart Stores East, LP*, 64 F.4th 1166, 1168 (11th Cir. 2023). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A genuine dispute only exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A material fact "is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

## III. Discussion

As a preliminary matter, we note that not all of Matthis' claims are properly before us on appeal. Matthis' response to Defendants' motion for summary judgment failed to respond to arguments concerning his state law claims and three of his § 1983 claims.[7] Therefore, those claims are abandoned as a matter of law. *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."). What remains is Matthis' claim that he was unlawfully seized without probable cause

---

[7] Specifically, Matthis' has abandoned the following claims: (1) Count II, § 1983 violation of due process; (2) Count III, § 1983 failure to supervise and train; (3) Count IV, § 1983 malicious prosecution; (4) Count VI, state law negligence; and (5) Count VII, state law malicious prosecution.

when he was arrested on February 20 and February 25 in violation of § 1983 and the Fourth Amendment.[8]

★          ★          ★

To seek money damages for a police officer's constitutional violation, a plaintiff must generally proceed under 42 U.S.C. § 1983, which provides a private right of action against any person who, acting under color of state law, deprives another of rights secured by the Constitution. But with § 1983 comes the defense of qualified immunity, which seeks to protect government officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806, 102 S. Ct. 2727, 2732 (1982).

To establish qualified immunity, an officer "first must show that he was acting in his discretionary capacity at the time of the alleged misconduct." *Paez v. Mulvey*, 915 F.3d 1276, 1284 (11th Cir. 2019). Afterwards, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id*. To succeed, the plaintiff

---

[8] Matthis' primary contention on appeal is that the District Court erred in accepting and adopting Defendants' statement of material facts, which he argues contained factual misrepresentations. On de novo review, however, this Court may affirm on any ground supported by the record and "may also choose to disregard a district court's determination of the facts for summary judgment purposes and determine those facts ourselves." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 n.5 (11th Cir. 2013). After a thorough review of the record, we conclude that there are no disputed facts that, if interpreted in a light most favorable to Matthis, might affect the outcome of his case. *See Allen*, 121 F.3d at 646.

25-14096          Opinion of the Court          11

must show that: (1) the defendant[s] violated a constitutional right; and (2) the unlawfulness of the conduct was clearly established at the time of the incident. *Id.*

Here, the constitutional right at issue resides in the Fourth Amendment, which provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."[9] U.S. Const. amend. IV. An arrest is the quintessential seizure of the person. *See Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009). And "[t]he reasonableness of a seizure or arrest under the Fourth Amendment turns on the presence or absence of probable cause." *Id.* (internal quotation marks omitted).

Specifically, "the Constitution permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 36, 99 S. Ct 2627, 2631 (1979). "Probable cause . . . [looks to] the totality of the circumstances to determine the reasonableness of the officer's belief that a crime has been committed." *Paez*, 915 F.3d at 1284. The "touchstone" is always "the reasonableness of the officer's conduct." *Id.* at 1286. "It does not

---

[9] The Fourth Amendment's protection against unreasonable searches and seizures is incorporated against the states through the Fourteenth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691 (1961).

require proof beyond a reasonable doubt or even by a preponderance of the evidence." *Manners v. Cannella*, 891 F.3d 959, 968 (11th Cir. 2018).

Combining the probable cause standard with the "clearly established" prong of qualified immunity, this Court has explained that an officer is entitled to qualified immunity as long as he had at least "*arguable* probable cause." *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990) (emphasis added) (internal quotation marks omitted). "Arguable probable cause exists where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff.'" *Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010) (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1232) (11th Cir. 2004)).

We agree with the District Court that the Defendant-officers had at least arguable probable cause to arrest Matthis on February 20 and February 25. We take each arrest in turn.

### A. *The February 20 Arrest*

Matthis was arrested on February 20, 2020, immediately after shooting Terry. Officers Williams and Frazier claim that Matthis' February 20 arrest was supported by probable cause to believe

that Matthis committed aggravated assault.[10] Matthis argues there was no probable cause.

Assault in Georgia occurs when a person "attempts to commit a violent injury to the person of another." Ga. Code Ann. § 16-5-20(a). It becomes aggravated assault when the assailant uses a deadly weapon. *Id.* § 16-5-21(a).

Of course, there is no dispute that Matthis satisfied the affirmative elements of aggravated assault when he knowingly shot Terry in the arm and leg. The more pertinent question is whether Matthis clearly acted in self-defense. Under Georgia's castle doctrine, a resident may—with no duty to retreat—defend his home with deadly force against another "to the extent that such threat or force is necessary to prevent or terminate such other's unlawful entry into or attack" upon the home. *Id.* §§ 16-3-23, 16-3-21.3. To operate as a full defense, one of the following circumstances must exist:

> (1) The entry is made or attempted in a violent and tumultuous manner and he or she reasonably believes that the entry is attempted or made for the purpose of assaulting or offering personal violence to any person dwelling or being therein and that such force is necessary to prevent the assault or offer of personal violence;

---

[10] The officers also claim there was probable cause that Matthis used a firearm during the commission of a felony. We need not reach argument this because it necessarily rises or falls on the underlying felony of aggravated assault.

14                          Opinion of the Court                    25-14096

(2) Th[e deadly] force is used against another person who is not a member of the family or household and who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using such force knew or had reason to believe that an unlawful and forcible entry occurred; or

(3) The person using such force reasonably believes that the entry is made or attempted for the purpose of committing a felony therein and that such force is necessary to prevent the commission of the felony.

*Id.* § 16-3-23.

With perfect hindsight, it is more than likely that Matthis' use of force was protected by one or more of these enumerated circumstances.[11] But "what counts for qualified immunity . . . is the information known to the defendant officers or officials *at the time of their conduct*, not the facts known to the plaintiff then or those known to a court later." *Jones v. Cannon*, 174 F.3d 1271, 1283 n.4 (11th Cir. 1999) (emphasis added). Here, a reasonable officer acting in reliance on Judge Manning's TPO may have assumed that Terry had a right to enter the home and was shot by someone who did not have a right to be there. *See Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 3039–40 (1987) (explaining that where officers

---

[11] Assuming Matthis did not know about the police officers' presence at his home, the incident—an unauthorized, forcible entry after dark—offers a paradigmatic illustration of why states like Georgia have adopted the castle doctrine.

"reasonably but mistakenly conclude that probable cause is present," those officers "should not be held personally liable"). The fact that the TPO was improperly granted is no fault of the Defendants.

Moreover, as we have explained before, "an affirmative defense to an alleged crime does not necessarily vitiate probable cause." *Paez*, 915 F.3d at 1286. This is because "police officers aren't lawyers; we do not expect them to resolve legal questions or to weigh the viability of most affirmative defenses." *Id.* A reasonable officer witnessing Matthis' use of force would certainly expect a self-defense claim to be in the picture. But we cannot say that such a defense would be so irrefutable as to nullify (at least arguable) probable cause.[12]

Perhaps an affirmative defense may, in some hypothetical scenario, be so undeniable that it serves to negate even arguable probable cause. But if that is the case, this Court has never identified it. *But see Kendig v. Stolar*, 173 F.4th 466, 477 (3d Cir. 2026) (holding that, in the context of a warrant-based arrest, an officer violates the Fourth amendment when he omits information regarding self-defense from an arrest affidavit when such information would "conclusively" negate probable cause). We leave that question open and simply hold that the facts here do not present such a case.

---

[12] For example, given Terry's repeated ringing of Matthis' video doorbell, a reasonable officer might have assumed that Matthis knew the officers were accompanying Terry to serve legal documents. If so, Matthis' use of force might not have been justified.

### B. The February 25 "Arrest" and Citation

Matthis was also briefly handcuffed[13] and issued a citation for reckless conduct when he visited the police station on February 25, four days after he was released from jail. Captain Rogers argues that the seizure and citation was justified by probable cause to believe that Matthis had endangered the bodily safety of the officers on the night of February 20. Matthis claims that any such determination was based on inaccurate, deceitful information.

Reckless conduct is a Georgia misdemeanor that occurs when a person:

> causes bodily harm to or endangers the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that his or her act or omission will cause harm or endanger the safety of the other person and the disregard constitutes a gross deviation of care which a reasonable person would exercise in the situation[.]

Ga. Code Ann. § 16-5-60(b).

Here, the officers had at least arguable probable cause to issue Matthis a citation for reckless conduct. Matthis is correct in his assertion that probable cause may not emanate from an officer's "deliberate falsehood or . . . reckless disregard for the truth." *Franks v. Delaware*, 438 U.S. 154, 171, 98 S. Ct. 2674, 2684 (1978). But it is

---

[13] Whether this seizure was an arrest or a *Terry* stop is an interesting question but was not an issue raised by either party on appeal. *See Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968).

also true that if the arresting officer would have maintained probable cause even with any misstatements set aside, there is no constitutional violation. *See id.* at 172–73, 98 S. Ct. at 2684–85.

We offer no opinion on whether Officer Williams fabricated evidence or lied about being grazed by Matthis' bullet. Rather, we hold that, even if she lied, Captain Rogers retained probable cause to issue a citation for reckless conduct because the other facts known to him at the time were sufficient. Namely, Captain Rogers knew that Matthis had fired shots at an individual trying to serve a court-ordered TPO in the presence of two police officers.[14] While additional facts, available now through an extensive record, serve to exculpate Matthis, we must consider only the facts known to the officer(s) at the time of arrest. *See Jones*, 174 F.3d at 1283 n.4.

## IV. CONCLUSION

For the aforementioned reasons, the District Court's grant of summary judgment is affirmed.

**AFFIRMED.**

---

[14] Reckless conduct does not require that any officer was actually struck or injured. *See* Ga. Code Ann. § 16-5-60(b).